# COURT OF APPEALS
## DECISION
## DATED AND FILED

## October 14, 2020

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2019AP2170-CR**

Cir. Ct. No. **2017CF232**

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT II

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

MONTRELL D. WASHINGTON,

DEFENDANT-APPELLANT.

APPEAL from a judgment and orders of the circuit court for Waukesha County: LEE S. DREYFUS, JR., and LAURA F. LAU, Judges. *Affirmed*.

Before Neubauer, C.J., Reilly, P.J., and Davis, J.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Montrell D. Washington appeals from a judgment of conviction and from orders denying his postconviction motions for plea withdrawal and sentencing credit.[1] We affirm.

## BACKGROUND

*Factual Background, Charges, and Preliminary Proceedings*

¶2 On January 8, 2016, the Waukesha County Sheriff's Department responded to a dispatch in the Town of Vernon and found the victim dead from a drug overdose. The victim's brother, Sean, told police that he had purchased heroin for his brother. According to Sean, he and his friend Thomas Sienkowski had traveled to Milwaukee the day before to buy heroin from Sienkowski's drug dealer. Sienkowski corroborated this statement and admitted to purchasing drugs from his dealer, "T."

¶3 On January 13, Sienkowski, acting as a confidential informant, conducted two controlled heroin buys from "T" under the direction of a Milwaukee area drug enforcement task force and the Waukesha County Metro Drug Unit. "T" was later identified as Washington.

¶4 At the time of these events, Washington was serving the extended supervision portion of sentences for two burglary convictions (case Nos. 10CF1917 and 11CF61). On April 5, an administrative law judge (ALJ) revoked Washington's extended supervision. The ALJ found that on or around November 2015 through January 2016, Washington engaged in various acts that

---

[1] The Honorable Lee S. Dreyfus, Jr., entered the judgment of conviction. The Honorable Laura F. Lau entered the orders denying Washington's postconviction motions.

2

violated his rules of supervision. There were eight allegations made against Washington; two of them concerned the January 13 heroin sales to Sienkowski. None of the allegations concerned the January 7 heroin sale that led to the victim's death. The ALJ ordered that Washington be returned to prison for the remaining time on each case: two years on case No. 10CF1917 to be served consecutive to two years, three days on case No. 11CF61. Washington received custody credit on case No. 11CF61 from January 25 through the date of the order.

¶5 On February 7, 2017, the State charged Washington with first-degree reckless homicide—party to a crime, for manufacturing and/or delivering the heroin that caused the victim's death. *See* WIS. STAT. §§ 940.02(2)(a), 939.05 (2017-18).[2] At the June 19 preliminary/arraignment hearing, Dr. Zelda Okia, the Waukesha County associate medical examiner, testified that the cause of death was mixed-drug (heroin and alcohol) intoxication. Okia explained that morphine was detected in the victim's blood; by comparing the levels of active ("free") versus total drug in the blood, Okia determined that the victim's use was "more recent"—"[p]erhaps hours." Okia also pointed to the presence of a heroin metabolite in the victim's urine, allowing her to conclude that the victim ingested the specific opioid heroin. Okia further noted injection sites on the victim; she sampled the sites, detected morphine, and determined the site at which the victim injected the fatal dose(s). Okia was thus able to conclude that "the heroin ingested by [the victim] was a substantial factor in causing his death." Following this testimony, the trial court found probable cause to believe that Washington

---

[2] All references to the Wisconsin Statutes are to the 2017-18 version.

committed the allegations in the complaint and bound Washington over for trial. Washington pled not guilty.

*Plea Hearing and Motion for Plea Withdrawal*

¶6      On January 19, 2018, Washington pled guilty in Waukesha County circuit court to the amended charge of second-degree reckless homicide in exchange for a recommended sentence of five years' initial confinement and ten years' extended supervision (the State did not take a position as to whether the sentence should be consecutive or concurrent to any other sentences).[3]  At the plea hearing, Thomas Harris, Washington's attorney, stated that he had met with Washington the day before and had reviewed the plea questionnaire/waiver of rights, along with the jury instructions explaining the elements of the crime. Washington had signed the forms, thus averring, "I have decided to enter this plea of my own free will.  I have not been threatened or forced to enter this plea.  No promises have been made to me other than those contained in the plea agreement."

¶7      The court conducted a standard plea colloquy, in which it reviewed the elements of the charge, the rights Washington was giving up, and the possible sentences that could be imposed.  The court asked Washington, "[O]ther than what's been stated here [as to the amended charge and sentencing recommendation], has anybody promised or offered you anything else in order to get you to plead today?"  Washington responded, "No."  The court further asked, "Is anyone forcing you or threatening you in any manner in order to get you to do

---

[3] It is unclear if Washington was serving any other sentences besides those for case Nos. 10CF1917 and 11CF61, the cases for which his extended supervision was revoked on April 5, 2016.

this today?" Washington again responded, "No." The court accepted Washington's plea and put over sentencing to another date.

¶8 Three weeks later, Washington brought a motion to withdraw his guilty plea on four alleged grounds: (1) he was facing pending charges in Milwaukee County and was told that those charges would be dismissed if he pled guilty in the Waukesha case, but those charges were not in fact dismissed; (2) his lawyer, Harris, "told me to take the deal or [Harris] would not be representing me anymore"; (3) the district attorney "threaten[ed] [that] if I didn't take the deal that I'll have to go straight to trial"; and (4) Harris pressured him in a more general sense to "take the deal":

> [M]y Attorney consistently [told] me I'm dumb to go to trial. Just take the deal [be]cause I'm guilty. In a way my Attorney [made] me feel guilty. I did not voluntar[ily] plead guilty. I was rushed into signing papers and just went along to please him.

¶9 Prior to the hearing on Washington's motion, the court considered a motion by Harris to withdraw as counsel. Harris explained to the court that Washington had "indicated some doubt … [as to] whether or not I've misle[d] him." Harris also pointed out that Washington's plea withdrawal motion could put Harris:

> in an adversarial position … where I would have to be called to testify as to whether or not I, in fact, pressured him or coerced him in any way. So both because [Washington] prefers a new set of eyes and because I'm potentially a witness at this point, I thought the better course would be to withdraw.

Washington confirmed that he understood that Harris's motion would remove Harris from the case, leading to the appointment of a new public defender. The

court then granted Harris's motion, allowing him to withdraw as Washington's counsel.

¶10   On June 29, 2018, the court heard Washington's plea withdrawal motion. The court considered testimony from Washington and arguments from both parties so as to determine whether a "fair and just reason" existed for Washington's plea withdrawal. *See State v. Bollig*, 2000 WI 6, ¶¶28-29, 232 Wis. 2d 561, 605 N.W.2d 199. As to Washington's first stated reason, Washington testified, "I thought Milwaukee was going to go along with the plea bargain to close this up, everything was just going to be closed up" (the Milwaukee County charges related to the possession, manufacturing, and delivery of illegal drugs). According to Washington, the Milwaukee authorities discussed this "global plea bargain" with him "multiple times" "in open court" prior to Washington pleading guilty in Waukesha.

¶11   Upon further questioning, Washington admitted that he had not brought any documentation to substantiate the Milwaukee offer (he explained that he did have documentation but was unaware that he needed to bring it to the hearing). Washington later clarified that the documentation itself might not fully corroborate his testimony, but he maintained that the "global plea bargain" promise was discussed several times on the record. He also admitted that he generally understood the purpose of plea questionnaires from past plea deals and that he had signed the questionnaire in the present case knowing that it did not promise a "global plea bargain." Washington further conceded that he was truthful during the plea colloquy when he stated that there were no promises made to him other than those contained in the plea questionnaire (however, he clarified, "Because Mr. Harris or [the district attorney] didn't promise me nothing. It was

Milwaukee County.") Finally, Washington admitted that Milwaukee might still dismiss its charges following the resolution of the Waukesha case.

¶12 As to Washington's second stated reason, that Harris threatened to quit if he did not take the deal, Washington pointed out that Harris did in fact move to withdraw as counsel after Washington moved to withdraw his plea. Regarding reasons three and four (pressure or threats from the district attorney and Harris), Washington explained that there was not necessarily "a verbal coerce …. Almost like a moving along too fast. It's like a sweeping me under the rug coercion." He "didn't want to go straight to trial" and wanted to keep negotiating: "I thought that I [could] have room for discussion … to … bring up stuff … to [the] court that I thought mattered with the case." The district attorney, however, "t[old] me I got to take this deal or just … go straight to trial." Washington again admitted, however, that he had truthfully signed the plea questionnaire indicating that he was not threatened and that he had truthfully stated as such to the trial court.

¶13 The trial court denied Washington's motion. It first explained that the purported Milwaukee "global plea bargain" was simply never raised or discussed during the Waukesha plea process. Moreover, the Milwaukee and Waukesha cases were not consolidated, so even assuming Milwaukee made Washington a promise, "enforceability would be an issue in Milwaukee County." The court also noted, however, that Milwaukee might very well uphold any promise upon the actual resolution of the Waukesha case—that is, upon sentencing. With respect to Washington's present plea deal, however, "there's nothing that Mr. Washington has [presented to] indicate[] that there was a misunderstanding, *in terms of what the agreement was here in Waukesha*." (Emphasis added.)

7

¶14 The trial court implicitly discounted or disbelieved Washington's remaining reasons for seeking plea withdrawal. As to Washington's second stated reason, that Harris threatened to quit, the court noted that that Harris was "still the attorney of record with regard to the matters that are pending in Milwaukee County," the implication being that Harris would not have continued to represent Washington in those matters if he had in fact made prior threats towards Washington or if Washington had pled guilty in response to those threats. The court further discounted reason three, explaining that it is standard practice for a district attorney to make a defendant an offer and, if that offer is declined, to proceed to trial. More generally, the court noted that Washington was "very clear … when [he] took the plea that other than what was said in court and put on the record, that … he hadn't been offered anything [and he] wasn't being forced or threatened in any manner."

¶15 The court concluded, "What appears to [be] the primary issue here is that Mr. Washington has continued to think about it …. My sense here is that he has changed his mind …." The court found that a mere "change of mind does not constitute what we would define as a fair and just reason under statute to allow for a plea withdrawal." Simply put, there was "nothing here that indicates that there's [new] or additional information that was not available at the time of the plea" or that Washington "was provided with misinformation or … simply didn't understand what was occurring." The court further noted that Washington's "experience" within the criminal justice system meant that he was familiar with a plea process and could be expected to understand what a guilty plea entailed. Therefore, the court concluded, Washington may have had "a change of heart," but he did not have "a just and fair reason for withdrawal."

*Sentencing and Postconviction Proceedings*

¶16    On July 20, 2018, Washington was sentenced to six years' initial confinement and six years' extended supervision, concurrent to his current sentences. The court granted 466 days of sentence credit because Washington had been detained in connection with the instant case since his March 30, 2017 initial appearance.

¶17    Washington moved for postconviction relief in a series of motions. First, Washington renewed the arguments he made in his presentencing motion for plea withdrawal. He maintained that his plea was the result of "misunderstanding … haste and confusion, and coercion," and he concluded that counsel's role in the plea process represented ineffective assistance. Second, he argued that counsel was ineffective on plea withdrawal because counsel did not challenge the medical examiner's (allegedly incorrect) cause-of-death determination at the preliminary hearing. Finally, Washington argued that he was entitled to sentencing credit from January 25, 2016, through March 29, 2017, because during that time he was held in custody for the same "course of conduct" charged in the homicide case. *See* WIS. STAT. § 973.155(1)(a).

¶18    The trial court denied Washington's first and second motions without a *Machner*[4] hearing. The court determined that it had already addressed and denied the "factual allegations and argument in the first motion," having found that the plea was not the result of misunderstanding, haste, confusion, or coercion. The court also implicitly found that Washington was not entitled to a

---

[4] *State v. Machner*, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).

9

*Machner* hearing on either motion because he had not alleged sufficient material facts that, if true, would establish deficient and prejudicial performance by trial counsel. *See State v. Allen*, 2004 WI 106, ¶¶9, 26, 274 Wis. 2d 568, 682 N.W.2d 433. The court further denied the request for sentence credit, finding no proof that Washington was detained prior to March 30, 2017, in connection with the instant case. This appeal follows.

## DISCUSSION

*Plea Withdrawal Based on Grounds Raised in Presentencing Motion*

¶19    Washington challenges the denial of his presentencing motion to withdraw his guilty plea. We construe his appellate briefs as raising two arguments: (1) that the trial court erroneously exercised its discretion prior to sentencing by not granting plea withdrawal; and (2) that the trial court erred in postconviction proceedings by not holding a *Machner* hearing on Washington's ineffective assistance of counsel claim relating to plea withdrawal.

¶20    Regarding Washington's first argument, "a circuit court should 'freely allow a defendant to withdraw his plea prior to sentencing if it finds any fair and just reason for withdrawal, unless the prosecution has been substantially prejudiced by reliance on the defendant's plea.'" *State v. Jenkins*, 2007 WI 96, ¶28, 303 Wis. 2d 157, 736 N.W.2d 24 (citation omitted). It is the defendant's burden, by a preponderance of the evidence, to show a "fair and just reason," meaning the defendant must show "some adequate reason for the defendant's change of heart" beyond mere "belated misgivings about the plea." *Id.*, ¶¶31-32 (citation omitted). "[G]enuine misunderstanding of the consequences of a plea is a fair and just reason" for plea withdrawal, *id.*, ¶34, as are "coercion on the part of

10

trial counsel" and "[h]aste and confusion in entering the plea," *State v. Cooper*, 2019 WI 73, ¶16, 387 Wis. 2d 439, 929 N.W.2d 192 (citation omitted).

¶21 This standard represents a relatively low bar, at least at the trial level. On appeal, however, we must give substantial deference to the trial court's factual findings from the presentencing evidentiary hearing, reviewing them for clear error. *Jenkins*, 303 Wis. 2d 157, ¶33. A finding of fact is "clearly erroneous" where "it is against the great weight and clear preponderance of the evidence." *Phelps v. Physicians Ins. Co. of Wis.*, 2009 WI 74, ¶39, 319 Wis. 2d 1, 768 N.W.2d 615 (citation omitted). This court searches the record not for evidence opposing the trial court's factual findings but for evidence in support. *Royster-Clark, Inc. v. Olsen's Mill, Inc.*, 2006 WI 46, ¶12, 290 Wis. 2d 264, 714 N.W.2d 530. We review the ultimate grant or denial of plea withdrawal for erroneous exercise of discretion, meaning we will sustain the trial court's decision where it "examined the relevant facts, applied a proper standard of law, and, using a demonstrated rational process, reached a conclusion that a reasonable judge could reach." *Jenkins*, 303 Wis. 2d 157, ¶30 (citations omitted).

¶22 Washington's stated reasons for requesting plea withdrawal were that he misunderstood the plea's consequences (he believed he was entering into a "global plea bargain" that would resolve criminal proceedings in Milwaukee County), he was coerced by counsel (Harris threatened to withdraw if he did not plead guilty), and the plea was made in haste and confusion (Harris and the district attorney pressured and threatened him; for example, the district attorney told him "to take the deal" or "go straight to trial"). The trial court assessed Washington's testimony and credibility and concluded that despite his assertions to the contrary, Washington had merely had a "change of mind" or "change of heart," as opposed to any "fair and just reason" for plea withdrawal. Therefore, we must determine

whether this conclusion and the relevant factual findings supporting it were clearly erroneous.

¶23    We find that that trial court's findings of fact were not clearly erroneous, in that the record supports its conclusion that Washington entered his plea free from threats, coercion, pressure, or misunderstanding. The trial court credited Washington with some level of sophistication within the criminal justice system, given his past guilty pleas. In the trial court's view, then, Washington simply would not have pled guilty in expectation of a "global plea bargain" without raising that possibility at some point during the *Waukesha* plea process. Most notably, Washington both knowingly signed the plea questionnaire and clearly attested in court that he was not promised anything other than what was contained in the plea questionnaire. In addition, Washington did not bring any evidence of the "global plea bargain" to the hearing, and he admitted on cross-examination that this documentation might not, in fact, substantiate Milwaukee's promise. The trial court further reasoned that even if some "global plea bargain" promise existed, "enforceability would be an issue in Milwaukee County." Thus, the trial court focused on any misunderstanding that might exist "in terms of what the agreement was here in Waukesha," and it determined that there was none. That determination was not clearly erroneous.

¶24    The record further supports the trial court's conclusion that Harris and the district attorney did not improperly threaten, pressure, or coerce Washington. The trial court again relied on the fact that Washington attested to the contrary in his plea questionnaire and in open court. In addition, the trial court found it noteworthy that Harris continued to represent Washington in pending Milwaukee cases, even after Washington filed his motion for plea withdrawal accusing Harris of improper coercion (which, for obvious reasons, did lead to

Harris's withdrawal as counsel in the Waukesha plea withdrawal motion). In the trial court's view, that relationship would not have continued had Harris in fact coerced Washington in the instant case. It also appears that the trial court did not believe in either the existence of, or the effect of, other alleged coercive acts by Harris. This is borne out by Washington's testimony, which on our review is vague and does not describe any specific threatening actions by Harris. Finally, the trial court correctly found that the district attorney acted in accordance with professional norms and did nothing more than truthfully describe the consequences of a failure to reach a plea agreement—that is, it was certainly true that Washington would have gone "straight to trial" had he not pled guilty. Therefore, as a matter of law, the district attorney's actions could not form the basis for a "fair and just reason" for plea withdrawal. Because the trial court was not clearly erroneous in determining that Washington merely changed his mind (i.e., that there was no "fair and just reason" for plea withdrawal), the trial court did not erroneously exercise its discretion in denying Washington's motion.

¶25 Washington next argues that he was entitled to a ***Machner*** hearing on his postconviction ineffective assistance of counsel claim relating to plea withdrawal. A postconviction hearing is required as a matter of law only where the defendant has made a legally sufficient postconviction motion—that is, where the defendant has alleged sufficient material facts that, if true, would entitle him or her to relief. *Allen*, 274 Wis. 2d 568, ¶¶9, 12-14. If, on the other hand, "the motion does not raise facts sufficient to entitle the movant to relief, or presents only conclusory allegations, or if the record conclusively demonstrates that the defendant is not entitled to relief, the circuit court has the discretion to grant or deny a hearing," and we will accordingly review that decision for an erroneous exercise of discretion. *Id.*, ¶9.

¶26    We find that as a matter of law, Washington's postconviction motion was insufficient to entitle him to a *Machner* hearing. His motion focused on the arguments made at plea withdrawal—that his plea was the result of misunderstanding, coercion, haste, and confusion. But the motion wholly failed to explain why the facts alleged, even if true, represented deficient and prejudicial performance by trial counsel. *See **Strickland v. Washington***, 466 U.S. 668, 687 (1984); ***Allen***, 274 Wis. 2d 568, ¶26 (to succeed on a claim of ineffective assistance of counsel, the defendant must show that counsel's performance was deficient and that the deficient performance was prejudicial). In fact, the only reference to ineffective assistance of counsel was in a heading ("Trial counsel was ineffective entitling Washington to an evidentiary hearing to withdraw his plea"). In such circumstance, we further find that the trial court did not erroneously exercise its discretion in denying a hearing. It appeared to the trial court, as it appears to us, that this motion concerned only the "factual allegations and argument" raised and ruled on at the presentencing evidentiary hearing, as opposed to any new issues that might fruitfully be explored at a *Machner* hearing.

*Plea Withdrawal Based on Medical Examiner's Cause-of-Death Determination*

¶27    Washington's second postconviction motion concerned alleged errors made at the preliminary/arraignment hearing, at which Okia, the medical examiner, testified as to the victim's cause of death. Recall that Okia determined cause of death from at least three observations: (1) that the relative level of free morphine in the victim's blood indicated recent drug use; (2) that a heroin metabolite in the victim's urine indicated that the victim ingested the opioid heroin, and (3) that injection sites on the victim's body contained sampled morphine and indicated where the victim injected the fatal dose.

14

¶28    In his motion to the trial court, Washington argued that Okia found the cause of death solely from the presence of a heroin metabolite in the urine and that such testimony was contrary to testimony Okia gave in a similar case that reached the Wisconsin Supreme Court. *See State v. Mattox*, 2017 WI 9, ¶¶15-17, 373 Wis. 2d 122, 890 N.W.2d 256. As recounted in *Mattox*, Okia explained that "substances detected in urine indicate the presence of the substances but cannot be used to determine the cause of death because 'urine typically concentrates the drugs.'" *Id.*, ¶17. According to Washington, "[t]rial counsel was ineffective for failure to object to Dr. Okia's testimony and raise the issue of cause of death," and "had [trial counsel] successfully objected … the state would have no connection of Washington to the victim's death." Essentially, Washington argued in his motion that the denial of effective assistance of counsel represented a "manifest injustice" warranting postsentencing plea withdrawal. *See State v. Bentley*, 201 Wis. 2d 303, 311, 548 N.W.2d 50 (1996).

¶29    On appeal, Washington contends that the trial court erred as a matter of law in denying his motion without a *Machner* hearing. Again, the standard is whether Washington's motion alleged sufficient material facts that, if true, would entitle him to relief, bearing in mind that the defendant is not entitled to relief where "the record conclusively demonstrates" otherwise. *See Allen*, 274 Wis. 2d 568, ¶¶9, 12-14. If Washington's motion did not meet this standard, then the trial court's denial of a hearing was a discretionary determination that we review under the deferential "erroneous exercise of discretion" standard. *See id.*, ¶9.

¶30    We find that Washington was not entitled to a *Machner* hearing because his motion failed to demonstrate either deficient performance or prejudice. First, Washington's motion wholly misconstrued Okia's testimony in this case. On review of the transcript, it is clear that Okia did not determine cause

15

of death exclusively from the urine sample but merely used the urine sample to support her conclusion that the victim ingested heroin, as opposed to another opioid. As a matter of fact, therefore, trial counsel was not ineffective for failing to object to this testimony, which on this record seems both correct and consistent with Okia's prior testimony in *Mattox*. Second, aside from conclusory and factually incorrect statements,[5] Washington failed to explain why counsel's allegedly deficient performance was prejudicial, which in this context means "that there is a reasonable probability that, but for the counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *See Bentley*, 201 Wis. 2d at 312 (citation omitted); *see also State v Hampton*, 2004 WI 107, ¶60, 274 Wis. 2d 379, 683 N.W.2d 14. Therefore, the trial court did not err as a matter of law in denying a *Machner* hearing. In addition, because this motion was merely based on a mischaracterization of Okia's testimony, we find that the trial court did not erroneously exercise its discretion in denying a hearing. *See Jenkins*, 303 Wis. 2d 157, ¶30.

*Sentencing Credit*

¶31    Finally, Washington argues that the trial court erred as a matter of law in denying him sentencing credit from January 25, 2016, through March 29, 2017. Under Wisconsin law, "[a] convicted offender shall be given credit toward the service of his or her sentence for all days spent in custody in connection with the course of conduct for which sentence was imposed." WIS. STAT. § 973.155(1)(a). "Course of conduct" means "the specific 'offense or acts'

---

[5] For example, Washington's argument that there would have been "no connection [between] Washington [and] the victim's death" without Okia's testimony is patently untrue given Sienkowski's statements to police implicating Washington in the victim's death.

16

embodied in the charge for which the defendant is being sentenced." ***State v. Tuescher***, 226 Wis. 2d 465, 470-72, 595 N.W.2d 443 (Ct. App. 1999). "A defendant seeking sentence credit in Wisconsin has the burden of demonstrating both 'custody' and its connection with the course of conduct for which the Wisconsin sentence was imposed." ***State v. Carter***, 2010 WI 77, ¶11, 327 Wis. 2d 1, 785 N.W.2d 516.

¶32 Washington has not met this burden. The record evidence indicates that Washington was detained on January 25, 2016, in connection with eight alleged violations of the rules of his extended supervision in case Nos. 10CF1917 and 11CF61. On April 5, 2016, the ALJ revoked Washington's extended supervision, having found all eight allegations proven. None of the conduct at issue in the revocation proceeding concerned the January 7, 2016 sale of drugs leading to the victim's January 8 death (two of the allegations did concern Washington's January 13 drug sales to Sienkowski, who at that point was acting as a confidential informant, but these actions plainly cannot form part of the same "course of conduct" as the heroin sale causing the victim's death). On March 30, 2017, Washington made his initial appearance in the present case; thus, a detainer was placed on him for this case beginning on March 30. All of the evidence indicates that trial court properly awarded sentence credit beginning on March 30, 2017, through the date of sentencing.

*By the Court.*—Judgment and orders affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.

17